CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

JAN. 31, 2021
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

UNITED STATES OF AMERICA

v.

JOHN MARSHALL HIGGINS,

*Defendant.*

Case No. 6:18-cr-10

MEMORANDUM OPINION

Judge Norman K. Moon

The Government charged Defendant John Marshall Higgins, in a superseding indictment, with twenty-one criminal counts in violation of 18 U.S.C. §§ 2, 242, 1341 and 1349. Dkt. 58. Upon consent of the parties, the Court conducted a six-day bench trial.

The first set of charges concerns whether Higgins deprived inmates Robert Eugene Clark (Counts I, II, III), Matthew Kessinger (also Count III) and Brandon Easterling (Count IV) of their Constitutional rights by either willfully depriving them of (a) the right of a pretrial detainee to be protected from foreseeable injury and violence resulting in bodily injury, or (b) the right to be free from a jail official's deliberate indifference to an inmate's serious medical needs, resulting in bodily injury. The second set of charges relates to whether Higgins conspired to commit, and committed, mail fraud involving honest services through his relationship with Westwood Pharmacy (Counts VII–XIX). In the third set of charges, the Government sought to prove that Higgins conspired to commit, and committed, mail fraud involving honest services through his relationship with inmate Nicholas Hansel and Hansel's family (Counts XX–XXIII).

As explained in the findings of fact and conclusions of law set forth below, the Court finds beyond a reasonable doubt that Higgins deprived Clark of his Constitutional

rights by acting with deliberate indifference to his medical needs and by failing to protect him from foreseeable injury and violence—resulting in bodily injury. Therefore, the Court finds Higgins **GUILTY** of Count I, Count II (as a misdemeanor), and Count III. The Court further finds beyond a reasonable doubt that Higgins conspired to commit, and committed, honest services fraud by providing preferential treatment to Hansel. Accordingly, Higgins is **GUILTY** of Counts XX, XXI, and XXII.

The Court finds Higgins **NOT GUILTY** of Count IV, Counts VII–XIX, and Count XXIII. The Government failed to put forth sufficient evidence to find that Higgins acted with deliberate indifference under Count IV. The Government further failed to prove beyond a reasonable doubt that Higgins engaged in a scheme to defraud the citizens of Rockbridge County and the Commonwealth of Virginia under Counts VII–XIX. As to Count XXIII, the Government did not show that Chris Lykes intended for Higgins to take favorable action that he would not have otherwise taken, when Lykes donated to the scholarship fund.

## I.  LEGAL STANDARD

Federal Rule of Criminal Procedure 23(a) allows a criminal trial without a jury when (1) the defendant waives a jury trial in writing; (2) the Government consents; and (3) the court approves. On July 30, 2020, upon the written consent of Higgins and the Government, the Court conducted a colloquy to ensure a knowing and voluntary waiver and approved the parties' decision to hold a bench trial in this case. Dkts. 171–73.

"In a case tried without a jury . . . the court must state its specific findings of fact in open court or in a written decision or opinion." Fed. R. Crim. P. 23(c). "When, as in this case, a jury trial is waived, the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts." *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987);

*see* 2 C. Wright, *Federal Practice and Procedure* § 374 (4th ed. 2020); *United States v. Kipp*, No. 315CR00244MOCDSC, 2017 WL 2662983, at *2 (W.D.N.C. June 20, 2017) ("In a bench trial, the court's duty is to. . . [*inter alia*] choose from among conflicting inferences and conclusions those which the court considers most reasonable."), *aff'd*, 793 F. App'x 166 (4th Cir. 2019). The Court has wide discretion to select among conflicting inferences to be drawn from the testimony. *Bales*, 813 F.2d at 1293.

After the parties consented to a bench trial, the Court issued the operative Amended Pretrial Order on July 20, 2020. Dkts. 164, 170–71. The Court held a bench trial for six days between August 17 to 24, 2020. Following the bench trial, the parties submitted, and the Court considered, proposed findings of fact and conclusions of law. Dkts. 215, 217, 219.

## II. FINDINGS OF FACT

Pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure, this Court makes the following findings of fact:

### A. Background

1. The Rockbridge Regional Jail ("RRJ") is located near Lexington, Virginia, in Rockbridge County, within the Western District of Virginia. RRJ is an independent governmental entity and is overseen by the Rockbridge County Regional Jail Commission and the Rockbridge County Board of Supervisors. During the relevant time period, Higgins was an elected member of the Rockbridge County Board of Supervisors and the Superintendent of RRJ. Tr. 8/17/20 at 243–44 (Simpkins). Higgins was Superintendent prior to 2006 and

until March 2017, when he resigned.[1] Tr. 8/17/20 at 185 (Almarode). He resigned after the Virginia State Police began its investigation into inmate treatment at RRJ. *Id.* As superintendent, Higgins had final authority to authorize or deny expenditures of jail funds, and final authority over the management of the inmate population. *Id.* at 109.

RRJ shares a building with the Rockbridge County Sheriff's Office ("Sheriff's Office"). The Sheriff's Office is a separate and distinct organization from RRJ and is the agency usually responsible for investigating crimes which may occur within RRJ. When one enters the facility, there is a set of main doors that lead to a lobby-like area. Two offices sit adjacent to the lobby: Ms. Jennie Gaines' office and Higgins' office. Gaines was Higgins' secretary. Although located in an unsecured area of the facility and open to the public, Higgins' office had a door that could be locked to provide privacy and security. Other key figures at the jail during Higgins' tenure included: Chief of Security, Derek Almarode; Lieutenant Jessica Whitten; and Major Candace ("Candy") Bane. *See* Tr. 8/18/20 at 52–53 (Whitten); Tr. 8/17/20 at 36–37 (B. Smith), 169–70 (Almarode); Tr. 8/19/20 at 122 (Bane).

2. As a matter of policy, an inmate sentenced to more than one year of imprisonment should be transferred to the Virginia Department of Corrections ("VDOC") to serve their sentence, absent extraordinary circumstances. When an inmate who otherwise should be transported to VDOC is not transferred, the Commonwealth of Virginia no longer reimburses the jail facility to house that inmate. Tr. 8/17/20 at 177–79 (Almarode).

---

[1] The Jail Commission appointed Derek Almarode as the interim superintendent on March 24, 2017. Tr. 8/17/20 at 185 (Almarode).

Inmates at RRJ are housed in either the "general population" blocks or the "trustee/work release" blocks. Trustees are distinct from work release inmates. Work release inmates may leave RRJ for employment in the community—returning to jail after the work is completed. In contrast, trustees may move only throughout RRJ in order to complete their work assignments. *Id.* at 106–07. Typically, under RRJ's policy, a new inmate may not immediately be placed into trustee status upon entering the jail. This allows RRJ time to evaluate and ensure that the inmate is qualified to fulfill the role of a trustee and to be given the accompanying privileges. *Id.* at 172–73. Major Candy Bane, who was at the time the second in command at RRJ, testified that exceptions to this policy "happened few and far between" during her 30-year career at the jail. Tr. 8/19/20 at 129 (Bane). Throughout those thirty years, Bane only knew of two inmates who became immediate trustees prior to Hansel's arrival—and both occurred under Higgins' tenure. *Id.*

RRJ affords work release inmates more freedom of movement than trustees. Work release status for VDOC inmates may only be granted with VDOC's permission upon request by the jail in which that inmate is housed. Between 2013 and 2017, Higgins sought work release approval from VDOC for more than thirty inmates. RRJ requires weekly verification of an inmate's compliance with work release. Tr. 8/18/20 at 163–64 (Newcomb).Work release inmates work a set schedule, and pursuant to RRJ and VDOC policy, cannot deviate from that schedule. Nor may inmates use work release time to do anything other than fulfill their work release obligations. *Id.* at 167; Tr. 8/17/20 at 187 (Almarode). Typically, RRJ tries to limit work release to no more than 40 hours per week. Tr. 8/19/20 at 118 (Bane). Higgins had the discretion to make exceptions to these rules, and he allowed some inmates to be out longer or to work on weekends. *Id.*

Even though regulations provide that inmates may not have visitors during work release, Gov't. Ex. 4 at 111; Tr. 8/18/20 at 167 (Newcomb), one witness, Keith Holland, testified that Higgins made exceptions to this rule. Keith Holland owned a farm that participated in the work release program from 2006 until 2017. According to Holland, work release inmates had asked Higgins' permission for visitation while at work on Holland's farm. Tr. 8/21/20 at 25 (Holland). If Higgins approved the request, the inmate would clear it with Holland. Holland testified about an inmate who provided care to his father while on work release. *Id.* Bradley Ruley, a work release supervisor for Holland, also testified that family members visited work release inmates at Holland's worksite while the inmates were on break. Tr. 8/21/20 at 61–62 (Ruley).

### B.  October 2016 Abuse of Clark (Count II)

3. Robert Eugene Clark was incarcerated at RRJ as a pretrial detainee on June 6, 2016. He faced multiple counts of felony sex offenses. Gov't. Ex. 2 at 103. During his time at RRJ, other inmates subjected Clark to significant abuse. On approximately October 28, 2016, Andrew Smith, another inmate at RRJ, called his father, Bruce Smith, and Andrew told his father that he had witnessed other inmates physically abuse Clark. Tr. 8/17/20 at 22, 26 (A. Smith), 36 (B. Smith). Andrew told Bruce that the offenders forced Clark to drink urine, and eat food mixed with feces and food mixed with pubic hair. Andrew also noted that the same inmates often assaulted Clark by slapping him in the face and shoving him around. Tr. 8/18/20 at 30–31 (Whitten). Bruce reported his son's observations directly to Higgins in a face-to-face conversation in Higgins' office. Bruce, referring to Clark, told Higgins about how some inmates beat up "that handicapped boy." Tr. 8/17/20 at 38 (B. Smith). Bruce and Andrew have two relatives who are mentally handicapped, and Andrew believed that Clark had a disability. Tr. 8/17/20 at 22 (A. Smith). In response, Higgins

instructed Lieutenant Jessica Whitten to speak with Andrew about the behavior in the cell block. Tr. 8/18/20 at 27–29 (Whitten). Andrew told Whitten and Higgins what he had witnessed—specifically noting that abusers smacked Clark on the face and pushed Clark around. *Id.* at 30–31; Tr. 8/17/20 at 31–32 (A. Smith). Andrew also told Higgins and Whitten that "if something didn't happen," something "horrible" would happen to the man, because they were "really beating on the dude." Tr. 8/17/20 at 21 (A. Smith). Additionally, Andrew identified three specific individuals who physically assaulted Clark. *Id.*

4. Andrew testified that Higgins was present during his interview with Whitten. *Id.* at 31–32. Whitten did not specifically recall that Higgins was there. Tr. 8/18/20 at 28 (Whitten). The Court accepts Andrew's account and finds it credible. Defense counsel argued that Andrew is biased, but any such risk of bias is lessened, particularly considering that Andrew is no longer an inmate at the jail. Tr. 8/17/20 at 31 (A. Smith). If anything, Andrew's desire to speak up on behalf of Clark appeared to arise from a sense of empathy because of Andrew's relatives with diminished mental capacities similar to Clark. Andrew also appeared sincere in his demeanor during his testimony. Based on Andrew's demeanor and the lack of motive to lie, the Court accepts Andrew's account that Higgins attended the meeting. *See id.* at 31–32.

5. Whitten testified that she reported her conclusions to Higgins that other inmates hazed and verbally abused Clark. This included inmates trying to take his meals and what she described as some "physical battering" that was "very minor." Tr. 8/17/20 at 117 (Almarode); Tr. 8/18/20 at 30–31 (Whitten). Nonetheless, Whitten also testified that she told Higgins that he needed to immediately transfer the perpetrators out of RRJ to other confinement facilities. Higgins took no action to separate Clark from his abusers or to dissuade or prevent other inmates from abusing Clark. When Higgins failed to take any

action, Whitten approached Higgins a second time to see that the perpetrators be removed from the facility. Higgins rebuffed Whitten's attempt and said he "would take care of it, not to worry about it"—a statement Whitten understood to mean, "let it alone." Tr. 8/18/20 at 30 (Whitten). Thereafter, Whitten sought Almarode's advice about the situation, and the two discussed the best way to proceed. They used a routine transfer operation to place two of Clark's worst abusers on a transfer list, moving them out of RRJ on December 22, 2016. Whitten and Almarode transferred those inmates without Higgins' knowledge or permission. Tr. 8/17/20 at 117–18 (Almarode).

### C. February 22, 2017 Phone Call Regarding Clark (Count III)

6. On February 22, 2017, investigators with the Sherriff's Office listened to a recorded jail phone call in which an inmate described prisoners physically assaulting Clark. Tr. 8/17/20 at 81–82 (Schley), 111–12 (Almarode), 234–35 (McFaddin); Tr. 8/18/20 at 117 (Ehrhard). The call included a claim that the abusers knocked out some, or all, of Clark's teeth. Officer Philip Flint, who listened to the call, informed fellow investigators about what he heard. His co-investigators reported the information to their supervisor, who in turn notified Almarode. Tr. 8/17/20 at 81–82 (Schley), 111–12 (Almarode), 234–35 (McFaddin); Tr. 8/18/20 at 117 (Ehrhard). Almarode did not prepare a written report about the phone call, nor did he prepare one about his discussion with the Sherriff's Office. Tr. 8/17/20 at 112–13, 201, 231 (Almarode). Instead, he met with Higgins in person. While Almarode was talking with Higgins about the issue, Higgins' phone rang, interrupting them. Almarode asked Higgins for instructions on how to proceed. Higgins said, "I'll take care of it," and began speaking on the phone—motioning Almarode out of the office. *Id.* at 113. According to Almarode, Higgins took no subsequent action. *Id.* at 114.

### D. The February 28, 2017 Abuse of Clark and Kessinger (Counts I & III)

7. On February 14, 2017, Matthew Kessinger was detained within RRJ in a pretrial status for felony offenses involving one or more sex crimes. Tr. 8/18/20 at 8 (Kessinger). Kessinger and Clark shared a cell in the 500-cell block. Between February 14 and February 28, 2017, other inmates abused Kessinger and Clark. Adam Booth, an inmate who participated in the abuse, testified to the type and severity of the harm inflicted. Tr. 8/17/20 at 58 (Booth). Booth was an inmate in the same cell block and was later charged with crimes against Clark and Kessinger. Between October 2016 and February 2017, Booth participated in, and witnessed, various forms of torturous conduct against Clark. *Id.* He corroborated much of Clark's testimony. The abusers physically assaulted Clark, including hitting him with a heavy ball made of paint chips, sodomizing him with a shampoo bottle, blowing food seasoning into his eyes, and forcing him to consume bleach and contaminated products. *Id.* at 56, 59; Tr. 8/18/20 at 194–96 (Clark). Over time, the abuse led to permanent scars on Clark's hand, long-lasting pain in his extremities, and severe bruising across large portions of his body and face. Other inmates also physically assaulted Kessinger, striking him with hard objects, scratching him with a sharpened pen, and forcing him to drink dangerous substances like bleach. Tr. 8/18/20 at 7–15 (Kessinger). Additionally, the abusers struck Kessinger with a hard object inside a sock and hit him on the head with the spine of a large book. Tr. 8/18/20 at 197, 199 (Clark).

Booth is a seven-time convicted felon, who hopes for leniency for his cooperation. Booth testified that he was part of the group that physically abused Clark. Given that he testified against his penal interest, the Court finds Booth's testimony to be credible.

8. Early in the morning on February 28, 2017, Kessinger climbed on top of a steel cage designed to allow jail staff to enter the cell block safely. Tr. 8/18/20 at 7–8 (Kessinger); Tr. 8/17/20 at 81–82 (Schley). Kessinger began yelling about the abuse he faced by other

inmates. He eventually got the attention of the guards. The guards responded by safely removing Kessinger from the cell block and contacting the Sheriff's Office. Lieutenant Donald Schley, an investigator with the Sheriff's Office, interviewed Kessinger, who alleged multiple instances of abuse against him and Clark. Tr. 8/17/20 at 83–84 (Schley); Tr. 8/18/20 at 13–14 (Kessinger). The Sheriff's Office opened an investigation into the accusations. Schley led the investigation along with Investigator Andrew Ehrhard and Deputy Sheriff Tony McFaddin. The investigators documented Kessinger and Clark's injuries in a series of photographs. Gov't. Exs. 17–24. The physical injuries corroborated the allegations of abuse, as dark bruising covered the bodies of Kessinger and Clark. *Id.* Higgins monitored the investigation on February 28, 2017 and knew about the details Kessinger shared during his interview.[2] Higgins approved Kessinger to be taken to the hospital, but only after Kessinger spoke with investigators. Tr. 8/17/20 at 123–24 (Almarode).

9. That same morning, while still held in the 500-cell block, Clark submitted a written note that he was the person responsible for Kessinger's injuries. Tr. 8/18/20 at 204–05 (Clark). Clark was subsequently removed from the cell block and interviewed as part of the investigation. Higgins and Almarode were present throughout Clark's interview with investigators. Tr. 8/17/20 at 134–35 (Almarode).

---

[2] Almarode testified that Higgins called him on the morning of February 28, 2017 about the incident. Higgins, presumably speaking about Clark and Kessinger, said that "they" had been poisoned. However, McFaddin told Schley by phone that "an inmate" may have been poisoned. It is unclear whether RRJ staff and the Sheriff's Office investigators believed both Clark and Kessinger had been poisoned, or just one of them. The Court does not need to make a finding of fact on this issue because of the other substantial physical injuries to Clark and Kessinger.

10. Clark told the investigators that he wrote the note taking the blame for Kessinger's abuse to protect Kessinger. It became clear that Clark's injuries were as bad as, or worse than, Kessinger's. Clark exhibited widespread and readily apparent physical injuries—the dark bruising nearly matched Clark's dark blue jumpsuit. Gov't. Exs. 17–21. His facial injuries included two black eyes, multiple other bruises on the face, and a busted lip. Clark's arms and torso had extensive bruises, both old yellowing bruises and newer bright purple bruises. *Id.* In the photos, the older and newer bruises overlap and become almost indistinguishable. Clark's upper arms and the backs of his legs appear to be one gigantic bruise. Clark's right hand was also swollen with deep scratches. His yellow bruises lead the Court to find that the abuse lasted at least a few days, if not more. Adam Booth testified to the severity of Clark's hand injury—saying that Clark's fingertips were ice cold and that Clark's fingers had started to lose color. The investigation also revealed that the perpetrators forced Clark to consume unknown liquids. Tr. 8/18/20 at 190–96, 199 (Clark). Abusers forced Clark to drink out of the toilet and an unknown liquid like "ice-cold water" with a "weird taste to it." *Id.* at 195.

During and after Clark's interview on February 28, he asked to go to the hospital for treatment. Higgins refused the requests. Instead, Higgins replied that Clark could see the nurse. At that point, Almarode protested to Higgins that Clark should receive hospital care—but Higgins still refused. Tr. 8/17/20 at 90 (Schley), 135 (Almarode); Tr. 8/18/20 at 113 (Ehrhard). After investigators finished questioning Clark, Higgins ordered Almarode to take Clark back to his cell block. Instead, without Higgins' permission, Almarode placed Clark in a new cell block, 606, so Clark would no longer be housed with his abusers. RRJ staff moved Kessinger to block 606 as well. Tr. 8/17/20 at 136–37 (Almarode). Later that day, one of the investigators, McFaddin, challenged Almarode about why nothing had been

done to protect those inmates since the intercepted phone call on February 22, 2017. Almarode responded that Higgins had said he would take care of it. Tr. 8/17/20 at 239–40 (McFaddin).

11. On March 1, 2017, the day after the incident with Kessinger, RRJ's contract jail physician, Dr. Moran, saw eleven patients, but Clark was not one of them. *See* Gov't. Exs. 29, 62; Tr. 8/18/20 at 46–49 (Whitten); Tr. 8/17/20 at 269 (Brammer). Dr. Moran provided onsite care on a mostly weekly, but irregular, basis. By that time, the fact that Clark had not seen the doctor caused concern among jail employees, including Ms. Ashley Knox, the jail records clerk. On March 1, 2017, Knox confronted Higgins in the staff breakroom about the denial of care to Clark. She told Higgins that no matter Clark's underlying crimes, he deserved medical treatment. Higgins responded with words to the effect of "that's why I am the big boss," or "that's why I get paid the big bucks." Tr. 8/17/20 at 250 (Knox). Almarode, who was in the room during this exchange, also commented that Knox was correct and that regardless of Clark's charges, Higgins should have permitted Clark to go to the hospital. Tr. 8/17/20 at 141 (Almarode).

12. On March 2, 2017, Clark complained to Head Nurse Gary Hassler about the pain in his hand, which was swollen and red. Tr. 8/18/20 at 200, 205–06 (Clark); Tr. 8/17/20 at 258–59 (Brammer). Clark filed an inmate request form on March 3. *See* Gov't. Ex. 40. Nurse Brammer responded to the request and observed Clark's hand. Believing Clark's hand was either broken, infected, or both, Brammer called Dr. Moran for instructions. Following the phone call, Brammer approached Whitten and Almarode for permission to let Clark go to the local hospital's emergency department. Whitten had supervisory authority over the medical section. Both Whitten and Almarode approved the request. *See* Tr. 8/17/20 at 144 (Almarode), 261 (Brammer); Tr. 8/18/20 at 34 (Whitten).

13. On March 3, 2017—approximately three days after Higgins first observed Clark's physical injuries—Clark finally saw a doctor, Dr. Goode, at Stonewall Jackson Hospital. Tr. 8/18/20 at 123–24 (Goode); *see* Gov't. Ex. 41. Dr. Goode, a qualified expert in emergency medicine, found that Clark's condition at the time presented serious medical needs that should have been evaluated promptly by a physician. Dr. Goode concluded, and this Court finds, that no layperson would have been able to properly evaluate Clark, given the extent of Clark's external signs of serious injury. Tr. 8/18/20 at 133, 146 (Goode). Dr. Goode evaluated Clark for head trauma, organ failure, internal bleeding, broken bones, and other serious, and potentially fatal, injuries. After ordering and assessing lab work and x-rays for Clark, Dr. Goode ruled out any infection and fractures. He diagnosed Clark with tissue edema and prescribed Clark Tylenol and Ibuprofen. *Id.* at 132–35. Aside from a Band-Aid placed on Clark's hand by Nurse Hassler, Dr. Goode's medical treatment was the first time Clark received medical care since the incident on February 28.

### E.   Brandon Easterling's Denial of Care (Count IV)

14. On December 4, 2016, Brandon Easterling was involved in a drunk driving automobile crash, which resulted in the death of his daughter and serious injuries to Easterling. After his accident, Easterling received treatment at Martha Jefferson Hospital, in Charlottesville, Virginia, for his most serious injuries. *See* Gov't Ex. 51 at 22–47. The hospital discharged Easterling after a few days. On December 13, 2016, Dr. Russell Buss provided emergency medical care to Easterling. He diagnosed Easterling with a broken neck and festering wounds in his scalp due to the presence of glass fragments that remained after the crash. Tr. 8/20/20 at 60–61 (Buss). Dr. Buss consulted with a neurosurgeon about Easterling's broken neck and a plastic surgeon about the glass fragments in Easterling's scalp. In his notes from Easterling's visit, Dr. Buss wrote, "[p]atient presents with acute illness with

systemic symptoms. In my opinion, this is a condition that a prudent layperson (who possesses an average knowledge of health and medicine) may expect to result in serious jeopardy, or cause serious impairment of bodily function, or serious dysfunction of bodily organs." Gov't. Ex. 51 at 24. Dr. Buss found the severity of Easterling's injury to be readily apparent. Following the consultation with Dr. Buss, Easterling scheduled several follow-up appointments, including a December 16, 2016, appointment with a plastic surgeon; a December 19, 2016, CT scan; and a December 20, 2016, appointment with a neurosurgeon. Easterling's medical file included written notice of these appointments. Gov't. Ex. 28 at 70, 85–88.

Easterling was arrested on December 15, 2016, for DUI manslaughter and related felony charges stemming from the December 4 car crash. He entered RRJ in a pretrial detention status. Upon arrival, RRJ cancelled Easterling's three previously scheduled medical appointments, at Higgins' discretion. Tr. 8/18/20 at 63 (Whitten). Easterling's RRJ medical file noted the cancellations. When Dr. Moran visited the jail on December 21, 2016 for his scheduled shift, he noted that Easterling's follow-up appointments had been cancelled, and needed to be rescheduled as soon as possible. Sometimes, Higgins cancelled medical appointments as a security measure. Cancelling scheduled appointments prevented inmates from knowing when they were being transported. In other instances, Higgins cancelled appointments if an inmate was in a position to make bond. If the court granted bond, the inmate could get treatment at his own expense. *Id.* at 63.

Higgins told Easterling that he supported Easterling receiving bond, which would permit him to get medical treatment. However, Easterling's motion for bond was denied on January 9, 2017, and he remained in custody at RRJ under the supervision of Higgins. The nurses at RRJ saw Easterling on a regular basis. On January 27, 2017, after more than

a full month at RRJ, Easterling received medical treatment from a neurosurgeon for his broken neck at a hospital in Charlottesville. Gov't Ex. 28 at 71. Easterling's medical file shows that his follow-up appointment with a plastic surgeon was cancelled yet again. *Id.* Easterling spent nearly a year at RRJ. Tr. 8/18/20 at 97 (Easterling). There is no evidence that his condition was made significantly worse due to the delay in treatment.

F.   Higgins' Relationship with Westwood Pharmacy (Counts VII–XIX)

15. Westwood Pharmacy is located in Richmond, Virginia. Sixty-five to seventy percent of Westwood's business is with correctional institutions—serving between twenty-five and thirty jails throughout Virginia. Tr. 8/20/20 at 19 (Stephen Dowdy). Beginning around March 2010, Higgins entered into an agreement with Westwood to provide pharmacy services to the inmate population of RRJ. There was no formal contract governing the relationship between Westwood and RRJ. Tr. 8/17/20 at 190 (Almarode); Tr. 8/19/20 at 124–25 (Bane). RRJ paid Westwood, on average, $4,000–$6,000 per month. RRJ was one of Westwood's smallest accounts. Westwood Vice President of Corrections Hunter Hoggatt[3] was the pharmacy's "liaison" with RRJ. Hoggatt was a longtime employee of Westwood and had familiarity with their business practices and operations. Higgins and Hoggatt knew each other personally. They played in golf tournaments together and, on occasion, Higgins took Hoggatt out to dinner. Tr. 8/18/20 at 86 (Whitten).

16. Beginning around December 2010, Higgins started filling personal prescriptions for Viagra at Westwood. *See* Gov't Ex. 55 at 14–28; *see* Tr. 8/20/20 at 38–43 (Shannon Dowdy). There is no evidence that Westwood sent Higgins' prescriptions to RRJ. Nor is

---

[3] The trial transcripts reference "Hunter Hogan." The Government avers that his name should read "Hunter Hoggatt." Hoggatt was not called as a witness, and the Government gave no reason why he was not called.

there evidence that Westwood charged RRJ for the prescriptions. In any event, Viagra has no legitimate use in correctional medicine.

17. Shannon Dowdy, the pharmacist in charge of retail operations at Westwood, testified that Hoggatt was largely responsible for ensuring that Westwood filled and mailed Higgins' personal Viagra prescriptions to Higgins' address in Lexington, Virginia. 8/20/20 at 33–36 (Shannon Dowdy). Dowdy said that Hoggatt personally mailed the prescriptions to Higgins. Hoggatt only provided this type of service to his family—not to other customers or representatives of correctional facilities. *Id.* at 36–37.

18. At the time, it was Westwood's practice not to mail or ship prescriptions until after a customer paid. Typically, when people picked up a prescription at the pharmacy they paid on the spot with cash, an HSA flex card, credit card, or personal check. *Id.* at 27.

19. However, enforcement of such practice at Westwood was a matter of discretion. Until several years ago, Westwood also maintained "house accounts." These accounts functioned as a running tab for repeat customers. House accounts were not tied to a payment method—making it difficult to determine if a customer paid for their prescription. There was no accounting system that simultaneously tracked mailed or shipped prescriptions and payment. The prescription software was not point-of-sale and only recorded which pharmacist filled prescriptions, where the prescription was shipped, who it was shipped to, and the assigned UPS tracking number to determine if the customer received the drugs. Thus, for a house account, there was no way for Westwood to determine if it received payment without calling the credit card company or looking at receipts/deposits that may have come in. Moreover, to successfully retrieve information on past payment with the credit card company, Westwood needed to have the customer's credit card number on file. Because house accounts posed obvious difficulties when it came

to verifying collection and payment, the pharmacy stopped using them "several years ago." *Id.* at 28–31, 45–48, 50 (Shannon Dowdy). Whether Higgins was a traditional customer, or a house account customer, is unclear. But the testimony reflects that there was no record of any kind as to whether Higgins paid by credit card, or failed to pay, for any of the prescriptions he received. *Id.* at 48.

20. Between December 2010 and January 2017, Westwood filled Viagra prescriptions for Higgins totaling more than $7,000. Gov't Ex. 55 at 14–28; *see* Tr. 8/20/20 at 38–43 (Shannon Dowdy). On the following dates, Westwood mailed or shipped prescriptions to Higgins in Lexington, Virginia:

| Date of Mailing | Cost of Prescription |
|---|---|
| 1. 07/30/2014 | $237.14 |
| 2. 10/10/2014 | $222.00 |
| 3. 01/26/2015 | $222.00 |
| 4. 04/02/2015 | $222.00 |
| 5. 07/07/2015 | $376.47 |
| 6. 10/29/2015 | $376.47 |
| 7. 02/05/2016 | $413.53 |
| 8. 05/03/2016 | $413.53 |
| 9. 06/29/2016 | $466.49 |
| 10. 09/23/2016 | $466.49 |
| 11. 11/13/2016 | $466.49 |
| 12. 01/31/2017 | $1100.00 |

21. Dowdy examined Westwood records to try and locate any filings indicating that Higgins paid for the prescriptions. In order to determine if he paid by credit card, she needed his credit card number. She attempted to review credit card receipts, but she did not know Higgins' credit card number she abandoned the search. *See* Tr. 8/20/20 at 47–48 She also investigated Higgins' patient file, searching for credit card charges and for checks from Higgins. Dowdy's search was unsuccessful. It is not clear whether Higgins paid by credit card for his prescriptions. *Id.* at 45–48, 50 (Shannon Dowdy). Following Higgins'

resignation and replacement as superintendent at RRJ, he stopped filling his personal Viagra prescriptions at Westwood. He still had refill prescriptions on file that he could have had filled. *Id.* at 44.

22. Between December 2010 and March 2017, Lieutenant Jessica Whitten and Chief of Security Derek Almarode each proposed to Higgins that RRJ could change pharmacy services providers and receive the same or better services for less money. When Whitten provided records from another regional jail to demonstrate potential savings, she witnessed Higgins ball up the paperwork and throw it in the trash. Higgins declined requests to examine other options for pharmacy services, saying things like, "you take care of your people," and "you never know when you're going to need a favor," and "it's good to have people in those kinds of places." Tr. 8/17/20 at 193 (Almarode); Tr. 8/18/20 at 62 (Whitten).

23. After Higgins resigned and Almarode was named superintendent, Almarode analyzed available options for pharmacy services for RRJ. He found significant savings and better efficiency for RRJ by ending the relationship with Westwood and securing pharmacy services from other sources. Moreover, Almarode revisited inmates in need of services, purchased cheaper prescriptions, and hired an interim physician until the jail could get contractual medical services. Tr. 8/17/20 at 193–95, 230–31 (Almarode).

G. Preferential Treatment of Nicholas Hansel (Counts XX–XXIII)

*a. Hansel's Privileges*

24. On about January 15, 2015, in the Circuit Court of Rockbridge County, Nicholas Hansel ("Hansel") was found guilty of one count of aggravated involuntary manslaughter, two counts of driving under the influence—victim permanently injured, and one count of driving under the influence. Gov't. Ex. 4 at 22, 62–63. That day, Hansel was sentenced to

a three-year term of imprisonment. He was immediately taken into custody and incarcerated at RRJ. *Id.* at 22, 56–57, 61. Higgins told Major Candy Bane that when Hansel arrived at RRJ, he was not to be assigned to the general population. Tr. 8/19/20 at 119–20 (Bane); Tr. 8/18/20 at 52 (Whitten). Instead, Higgins instructed Bane to assign Hansel to the trustee block of RRJ. A note was left in the control room to this effect. Tr. 8/19/20 at 120 (Bane). Hansel was assigned to general population on his first day at RRJ but was reassigned to the trustee block of the jail the next day. Gov't. Ex. 4 at 116.

Hansel's inmate file included a note stating, "PER SUPERINTENDENT HIGGINS DO NOT RELEASE NICHOLAS HANSEL UNLESS APPROVED BY HIM." *Id.* at 46. Jail staff knew this note referred to releasing Hansel to the custody of VDOC, as would be normal policy due to the length of Hansel's sentence. Tr. 8/19/20 at 120–21 (Bane). RRJ had a common practice of "trading" inmates with VDOC when VDOC called about a trustee that RRJ wished to keep. Higgins had previously requested that certain inmates not be transferred to VDOC if they had a special trade skill. Tr. 8/17/20 at 177 (Almarode). For instance, if an inmate was a carpenter, a cook, or had an electrical license, RRJ could effectively claim the benefit of their skill—and have them remain at the jail. *Id.* at 78. The practice also encouraged skilled workers to teach other inmates their craft. Almarode testified that Hansel did not have any specific skill or trade advantage. *Id.* at 181. In fact, RRJ's maintenance director trained Hansel to mow the grass and wash cars. *Id.* Nonetheless, a note in Hansel's VDOC file states: "6/5/15 per lynn [sic] jail wants to keep." Gov't. Ex. 60 at 6. Lynne Mutterspaugh was an employee of RRJ.

25. While incarcerated at RRJ, Hansel received preferential treatment and significant privileges that RRJ policies and practices otherwise prohibited or made unavailable to other inmates. *See* Tr. 8/17/20 at 168 (Almarode), 252 (Knox); Tr. 8/18/20 at 52, 54, 56–

58, 78, 81, 87–88 (Whitten), 168–69 (Newcomb); Tr. 8/19/20 at 30–31, 37–39 (Hostetter), 64–69 (Vassar), 96–97 (Mays), 121–23 (Bane). Such privileges included, but were not limited to:

a.  Hansel had unsupervised in-person "contact visits" with family members in violation of jail policy that only allowed non-contact visits. Hansel had these contact visits with his family in Higgins' office.

b.  Higgins called jail staff after hours to unlock his office for Hansel's use.

c.  Hansel had almost complete freedom to move about RRJ and to use its facilities, including the kitchen and food supplies, at any time he desired.

d.  Higgins brought frozen yogurt or ice cream from outside businesses to Hansel on more than one occasion.

e.  Higgins allowed Hansel to maintain, for his personal use, a small office space in the maintenance shed.

f.  Hansel used the jail's telephone and computer devices for his personal use.

g.  Hansel had unsupervised visits with family and friends at the Hostetter's farm. The Hostetters own the Hostetter Excavation company and supervised Hansel during his work release.

26. In June 2016, RRJ reverted to a "basic cable package" for its cable television service. After Hansel complained that the television at RRJ did not have sports channels, Higgins ordered a jail employee, Melinda Newcomb, to return to the prior cable service. Higgins told Newcomb that Hansel wanted more sports channels. The next month, at Higgins' direction, Newcomb increased RRJ's cable service. Inmates' commissary account profits paid for the cable bill at RRJ. Tr. 8/18/20 at 154–57 (Newcomb); Gov't. Exs. 52, 53.

*b.  Donations to the Scholarship Fund*

27. In the Spring of 2016, Higgins and his sister-in-law, Sherry Simpkins, a former RRJ employee, created the Tyler Swisher Memorial Scholarship Fund ("Scholarship Fund") in memory of Simpkins' son and Higgins' nephew, Tyler Swisher, who was killed in a lawnmower accident in July 2015. Higgins and Simpkins solicited donations for the Scholarship Fund and shared flyers soliciting donations for a golf tournament and raffle to raise funds for the scholarship. These flyers included Higgins' name and contact information. Tr. 8/18/20 at 217–18, 224–25 (Simpkins); Gov't. Ex. 42.

28. On May 2, 2016, Higgins emailed a Scholarship Fund flyer to Hansel's stepmother—at her request. Gov't Ex. 58. One week later, on May 9, 2016, Hansel's father and stepmother, Stephen and Dana Hansel, mailed two checks in the amount of $1,000.00 each, payable to the Scholarship Fund, to Higgins' residence in Lexington, Virginia. The checks were written from the accounts of Eclectic Investment Management LLC & M&I Institutional Development LLC—companies owned by Stephen and Dana Hansel. *See* Tr. 8/18/20 at 221–24 (Simpkins); Gov't. Exs. 44 at 2; 49 at 8–9.

29. The same day (May 9, 2016), Elizabeth and Chip Goodyear also mailed a check in the amount of $500.00, payable to the Scholarship Fund, to Higgins' residence in Lexington, Virginia. Tr. 8/18/20 at 232–34, 236–38 (Simpkins); Gov't. Ex. 43 at 2–5. The Goodyears have no relationship with Simpkins. Their only connection to Higgins is through their friendship with the Hansels. The Goodyears included a card with their check that stated:

> Mr. Higgins,
> We are close friends of Nick Hansel and his family and we are so truly sorry to learn of the tragic loss of your nephew Tyler. Nothing will ever bring Tyler back but how wonderful to channel your loss into such a positive way to make a real impact on other lives – wishing you success on your golf tournament and scholarship!
> Please give your sister our best.
> Sincerely,
> Elizabeth & Chip Goodyear

30. And the following day (May 10, 2016), Hansel's mother, Sarah Klein (a/k/a Sarah Hansel) mailed a check in the amount of $500.00, payable to the Scholarship Fund, to Higgins at his residence in Lexington, Virginia. Gov't. Exs. 49 at 10; 45 at 4–5. A card included with the check stated:

> Dear John,
> I wanted to thank you again for all your kindness to us during my trip to Virginia in March. It was so good to see Nick [and] be able to actually give him a hug and spend some time face to face with him.
> I'm so proud of the work he is doing in the schools. I was able to see a video clip from one of the local tv stations and I was thrilled to see how intently the kids in the audience were listening to the message Katie [and] Nick were sharing. I think it really helps that the two of them look so young [and] not too far from high school themselves. I pray that their message saves [and] changes lives. I know it isn't easy for Nick to do these presentations, but it is worth the pain to make a real difference!
> Please accept the enclosed donation to the golf tournament for the scholarship in your nephew's honor. What a great thing to do. I pray it is a great success! See ya soon!
> Sarah
> P.S. I hope to be back up in June. Missing my boy! 😊

31. On May 16, 2016, a bank account was established at SunTrust Bank in the name of the Scholarship Fund. This bank account designated Higgins as an authorized signatory on the account. Gov't. Ex. 49 at 2–10.

32. On May 25, 2016, at the request of Dana Hansel, Christopher Lykes, a resident of Tampa, Florida, and friend of the Hansel family, mailed a check in the amount of $500.00 and payable to the Scholarship Fund to Higgins at his residence in Lexington, Virginia. The check was drawn from the account of the Christopher Lykes Revocable Trust. Lykes did not know that Higgins was RRJ's jail administrator. Lykes also denied that he donated to the Scholarship Fund with the intent to provide benefits to Hansel. Lykes had no connection to Higgins or Simpkins. Tr. 8/19/20 at 9–12, 15–18 (Lykes); Gov't. Exs. 46 at 2; 49 at 7.

33. All the aforementioned checks were deposited into the SunTrust Bank account in which Higgins was an authorized signatory. There is nothing in the record about whether Simpkins or Higgins deposited the checks. Simpkins did not have a relationship with Hansel or with any member of his family and did not solicit donations from any member of Hansel's family. Except for Nick Hansel's family, no other families of inmates at the RRJ contributed to the Scholarship Fund in 2016.

In May 2016, Olivia Manning provided a hat signed by NFL quarterback Peyton Manning to Higgins as an auction item for the Scholarship Fund. Manning provided the hat at the request of the Hansel family. Tr. 8/18/20 at 80 (Whitten). A review of Scholarship Fund records demonstrates that the Hansel family and friend's donations were the largest cash donations made to the Fund in 2016.

34. On March 31, 2017 Klein sent a package addressed to Simpkins, which included a $375 check for the Scholarship Fund, a letter from Klein to Simpkins, and a separate sealed envelope from Klein addressed to Higgins. Tr. 8/19/20 at 241–43 (Simpkins); Gov't. Ex. 48 at 4–5. The letter from Klein stated, in part:

> Please give the enclosed letter to John. I am broken hearted for all that he has to go through right now. He is such a kind, generous person. I have been praying for him ever since I first heard about the investigation at the jail. . . I didn't want to send this to his address directly because I don't want there to be any indication of impropriety – which of course doesn't exist – but I just don't know who might be watching his mail, etc. (My family sometimes says I'm a bit paranoid about the government watching us.)

The return address on the package was listed as "Klein Construction" (her husband's business), as opposed to the home address of Sara Klein. After Higgins was no longer employed at RRJ, he took very little action to assist the Scholarship Fund in raising money.

*c. Hansel's Work Release*

35. Higgins wrote more than thirty letters to VDOC on behalf of inmates seeking work release during the period from 2014 through 2017. On September 20, 2016, Higgins wrote a two-page letter to VDOC requesting Hansel be allowed to participate in work release, and included a newspaper article regarding Hansel's conviction. Comparatively, letters written by Higgins on behalf of other inmates during this same time period were seldom more than a two to three sentences in length. *See* Tr. 8/19/20 at 112–13 (Witt); Def. Exs. 19–64.

On October 7, 2016, VDOC granted Higgins' request to allow Hansel to participate in work release. Higgins secured a work release position for Hansel at Hostetter Excavating, working in the back office. The other inmates who worked for Hostetter Excavating did so in a construction-labor capacity. On October 11, 2016, Hansel began work release employment at Hostetter Excavating. Hostetter Excavating paid Hansel $10 an hour and $15 an hour overtime. Hostetter Excavating was required to pay Hansel for any time that he was out of jail for his work release employment. *See* Tr. 8/19/20 at 29–31, 33, 40 (Hostetter).

36. Higgins made it known to jail staff that he would be responsible for verifying Hansel's compliance with work release requirements. A note placed in Hansel's inmate file stated, "PER SUPT. HIGGINS – HE WILL CHECK THIS INMATE!" Tr. 8/18/20 at 164 (Newcomb); Gov't. Ex. 4 at 89, 90, 95, 149. Between October 11, 2016, and March 14, 2017, there is only one occasion listed in Hansel's inmate file that Higgins, or any other jail employee, verified Hansel's compliance with his work release requirements. Gov't. Ex. 4 at 95–98. During that time Hansel routinely left the jail under the pretense of work release and remained away from the jail even when Hostetter Excavating was closed. Tr. 8/18/20 at 169–74 (Newcomb).

For instance, Hansel left the jail every Saturday and Sunday between October 11, 2016, and March 4, 2017, except for January 22, 2017, even though Hostetter Excavating was closed for business on the weekends. Heather Hostetter had Hansel babysit her children and do chores at their home on weekends—something only one prior inmate had done. Hansel left the jail on Thanksgiving Day (November 24, 2016), Christmas Day (December 25, 2016), and New Year's Day (January 1, 2017), even though Hostetter Excavating was closed for business on those days. There is no valid reason Hansel would have been permitted to leave RRJ on those days if Hostetter Excavating was closed. Hansel also attended sporting events in the community with the Hostetters—though this violated RRJ work release program policies. *See id.* at 165–66, 169–74; Tr. 8/19/20 at 33–37 (Hostetter), 110 (Witt); Gov't. Ex. 15 at 17–18, 28, 30.

Between October 11, 2016, and March 4, 2017, Hansel, under the auspices of participating in work release, had multiple unsupervised visits with family members at a farm owned by the Hostetters. Hansel's family stayed at the Hostetters' farm when they visited Hansel. There is no direct evidence that Higgins told the Hostetters to give Hansel special privileges, nor that he requested for Hansel's family to stay on their farm. *See* Tr. 8/19/20 at 37 (Hostetter).

With regards to privileges Hansel received, Higgins told Almarode something to the effect that the Hansel family was influential and "it was good to have people like that." Tr. 8/17/20 at 172 (Almarode). Higgins also told Bane that the Hansel family donated to his political campaign for the Rockbridge County Board of Supervisors.[4] Tr. 8/19/20 at

---

[4] The Court has considered the testimony of the inmates who testified that Hansel said that "his dad sent John Higgins $20,000," and that Hansel was Higgins' "honey hole." *See e.g.*, Tr.

124 (Bane). Stephen and Dana Hansel lived in Florida and had no connection to Rockbridge County except that Hansel went to Washington & Lee and was incarcerated at RRJ. Tr. 8/19/20 at 19 (Lykes). The same is true of Sarah Klein, who lived in New Orleans. Tr. 8/18/20 at 224 (Simpkins).

37. Hansel was released from custody on or about July 31, 2017, never serving any portion of his sentence in the Virginia Department of Corrections. Tr. 8/17/20 at 179 (Almarode).

## III.    CONCLUSIONS OF LAW

### A.  Willful Deprivation of Constitutional Rights (Counts I–IV)

The superseding indictment charges Higgins with violating 18 U.S.C. § 242, which makes it a crime for any person acting under state law to willfully deprive another of his or her Constitutional rights. For the Court to find Higgins guilty under Section 242, the Government must prove each of the following elements beyond a reasonable doubt: (1) Higgins acted under color of law;[5] (2) Higgins deprived a person of a right secured or protected by the Constitution or laws of the United States; (3) Higgins acted willfully, and (4) the inmates suffered bodily injury as a result of Higgins' conduct.[6] The Court finds that the Government has proven beyond a reasonable doubt these elements as to Counts I and III. The Court finds that Higgins is guilty of Counts I and III. The Court also finds that the

---

8/19/20 at 86 (Kimberlin), 98 (Mays). The Court gives that testimony no weight because the statements lacked context.

[5] The Court finds Higgins acted under color of law.

[6] Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina § 18.242 (2019 Online Edition); *United States v. Perkins*, 470 F.3d 150, 153 n.3 (4th Cir. 2006); *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990).

Government has proven elements (1)–(3) as to Count II, and finds Higgins guilty of a misdemeanor under § 242.[7]

However, the Court finds that the evidence is insufficient to establish beyond a reasonable doubt that Higgins acted with deliberate indifference that resulted in bodily injury under Count IV (deprivation of Easterling's rights between Dec. 15, 2016 and Jan. 27, 2017). Accordingly, the Court finds Higgins not guilty of Count IV.

### a. Deprivation of Clark's Rights (Feb. 28, 2017—Mar. 3, 2017) (Count I)

Count I charges Higgins with willfully depriving Clark, during the period on or about February 28, 2017 through March 3, 2017, of due process of law—including the right of a pretrial detainee to be free from jail officials deliberate indifference to serious medical needs, resulting in bodily injury. Under this Count, the Government must also show that Higgins' deliberate indifference resulted in bodily injury to Clark. "Bodily injury" means a cut, abrasion, bruise, burn, or disfigurement; physical pain; illness; impairment of the function of a bodily member, organ, or mental faculty; or any other injury to the body, no matter how temporary.[8]

The evidence shows Higgins deprived Clark of this right. Around February 28, 2017, during Clark's time at RRJ, abusers significantly beat and bruised him. The perpetrators inflicted severe physical harm and pain on Clark. He had readily apparent, widespread injuries. Abusers forced Clark to consume unknown foods and liquids.

---

[7] A violation of § 242 may be charged as a misdemeanor or a felony. *See* 18 U.S.C.A. § 242 (West 2000). If "bodily injury" results from the acts committed in violation of § 242, then the defendant is guilty of a felony. *Perkins*, 470 F.3d at 151.

[8] Ruschky, *supra* note 6 at § 18.242; *Perkins*, 470 F.3d at 153 n.3.

Although aware of the abuse Clark suffered, Higgins refused to allow Clark to be hospitalized. That stands in contrast to fellow inmate Kessinger, whom Higgins allowed to be hospitalized that same day for similar injuries. Higgins did nothing to ensure that Clark received any medical treatment for his injuries. His lack of action was so evident, that multiple jail employees and subordinates—including a records clerk—stated to Higgins that they believed Clark should receive medical assistance. Nonetheless, Higgins refused to authorize Clark to receive medical care. As a result of Higgins' actions, Clark waited three days for any care. Clark complained about the pain in his hand on March 2. He also submitted an intake request form because of the discomfort on March 3. This ongoing pain is enough to satisfy the element that Higgins' deliberate indifference resulted in bodily injury. Higgins prevented Clark from getting prompt medical care for his severe bruising and swelling. When Clark was eventually sent to the hospital for medical treatment three days later, it was done without Higgins' prior knowledge or permission.

The Court finds beyond a reasonable doubt that Higgins willfully deprived Clark of his Constitutional rights by acting with deliberate indifference toward Clark's serious medical needs, resulting in bodily harm during the period of February 28, 2017 through March 3, 2017. Thus, the Court finds Higgins guilty under Count I.

### b. Deprivation of Clark's Rights (Oct. 28, 2016—Dec. 22, 2016) (Count II)

Count II charges Higgins with willfully depriving Clark, during the period on or about October 28, 2016 through December 22, 2016, of due process of law, including the right of a pretrial detainee to be protected from the harm of foreseeable injury and violence, resulting in bodily injury. The Court finds Higgins guilty of the lesser included misdemeanor offense under § 242. *See* 18 U.S.C.A. § 242 (West 2000); *Perkins*, 470 F.3d at 151; *see also United States v. Koegel*, 777 F. Supp. 2d 1014, 1019 (E.D. Va. 2011)

(finding that the Court could still consider the less included offense in a criminal bench trial).

The evidence shows that Higgins willfully deprived Clark of protection from the harm of foreseeable injury and violence. After Bruce Smith made Higgins aware of the abuse against Clark, Higgins asked Whitten to investigate the allegations. Whitten recommended that Higgins immediately transfer the perpetrators out of RRJ. On two occasions Higgins rejected her recommendation. But the evidence did not clearly establish that Clark suffered any bodily injury as a result of Higgins' conduct between October 28, 2016 and December 22, 2016. This is true, even though bodily injury can be "fleeting." *Perkins*, 470 F.3d at 161.

Therefore, the Court finds the Government proved beyond a reasonable doubt that Higgins willfully deprived Clark of his right to be free from foreseeable injury. The Government failed to prove beyond a reasonable doubt that Higgins' actions resulted in bodily injury between October 28, 2016 and December 22, 2016. Thus, Higgins is guilty of the lesser-included misdemeanor offense under Count II.

*c. Deprivation of Kessinger & Clark's Rights (Feb. 23 and 28, 2017) (Count III)*

Count III charges Higgins with willfully depriving Clark and Kessinger, during the period on or about February 23, 2017 through February 28, 2017, of due process of law, which includes the right of a pretrial detainee to be protected from the harm of foreseeable injury and violence, resulting in bodily injury. Additionally, the Government can meet its burden if it shows that the elements of the charge are met as to either Kessinger *or* Clark. *United States v. McCullough*, 631 F.3d 783, 793 (5th Cir. 2011) ("The Government made no mention of any second victim during trial, purposefully limiting its case to the

conspiracy to kill Evans. While this discrepancy is surely a 'variance,' it is just as surely not 'material.'"); *see United States v. Miller*, 471 U.S. 130, 136–37 (1985).

Insofar as it relates to Kessinger, the Government has not met its burden of showing that Higgins willfully deprived Kessinger of his Constitutional right, resulting in bodily injury. To be sure, abusers brutally beat and abused Kessinger during the relevant time frame. However, the severity or existence of these injuries were not reported or made known to jail staff until after the incident occurred on February 28, 2017. There was no evidence that Higgins acted with the specific intent to deprive Kessinger of his rights. In fact, there was no evidence showing that Higgins knew Kessinger suffered any abuse prior to February 28, 2017. Higgins also permitted Kessinger to go to the hospital after being interviewed. The delay of a few hours in getting Kessinger medical care on these facts did not establish any additional injury to Kessinger.

Regarding Clark, the Government has proven Higgins is guilty beyond a reasonable doubt. Almarode notified Higgins on February 22, 2017 about the intercepted phone call, in which an inmate described prisoners physically assaulting Clark. The call included a claim that the abusers knocked out some, or all, of Clark's teeth. This was in addition to the earlier warnings Higgins received from the Smiths and Lieutenant Whitten in October 2016.

Between February 23, 2017 and February 28, 2017, Higgins failed to stop other inmates from abusing Clark, even though Higgins was on notice that Clark may suffer further bodily harm. In fact, Higgins did not take any action to prevent the abuse. As a result, Clark suffered extensive physical injuries at the hands of other inmates. His facial injuries included two black eyes, multiple other bruises on the face, and a busted lip. Clark's arms and torso had significant bruising—both old yellowing bruises and newer

bright purple bruises. The abusers also injured Clark's hand—leaving it swollen and red. Another inmate, Adam Booth testified that Clark's fingertips were ice cold and his fingers had started to lose color.

The Court finds, beyond a reasonable doubt, that Higgins willfully deprived Clark of his right to be free from foreseeable bodily harm. Clark suffered from severe bruising all over his body, a swollen red hand, and a busted lip due to Higgins' inaction. Accordingly, the Court finds Higgins guilty under Count III as that count relates to Clark.

### d. Deprivation of Easterling's Rights (Dec. 15, 2016 and Jan. 27, 2017 (Count IV)

Count IV charges Higgins with willfully depriving Easterling, during the period on or about December 15, 2016 through January 27, 2017, of due process of law, which includes the right of a pretrial detainee to be free from a jail official's deliberate indifference to serious medical needs. The final element for this offense is that Higgins' willful actions resulted in bodily injury to Easterling.

Although Easterling suffered substantial trauma from his accident in December of 2016, the evidence also shows while at RRJ, the jail's nursing staff attended to Easterling. RRJ nurses saw Easterling on a regular basis until he received medical treatment from a neurosurgeon at a hospital in Charlottesville on January 27, 2017. In addition, the Government did not provide evidence as to whether Easterling's plastic surgery appointment was ever rescheduled.

The Court does not find beyond a reasonable doubt that Higgins acted with deliberate indifference towards Easterling's serious medical needs. Nor does the evidence show additional trauma or injury caused by canceling Easterling's appointments. Accordingly, the Court finds Higgins not guilty under Count IV.

### B. Honest Services Fraud—Westwood Pharmacy (Counts VII – XIX)

Count VII charges Higgins with 18 U.S.C. § 1349—conspiracy to commit honest services fraud. Counts VIII–XIX charge Higgins as a principal and as an aider and abettor of honest services fraud under 18 U.S.C. §§ 2, 1341, and 1346. Under the Section 1349 conspiracy charge, the Government must prove beyond a reasonable doubt that Higgins conspired to commit fraud under Sections 1341 and 1346. As to Counts VIII–XIX, the Government must prove beyond a reasonable doubt that Higgins knowingly and willfully entered into a scheme or artifice to defraud by means of using material false representations or promises, that Higgins used the mail in furtherance of that scheme, and that Higgins intended to defraud Rockbridge County of honest services.

A *quid pro quo* may be shown through a "stream of benefits." To find a stream of benefits, the factfinder must: (1) conclude that the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take; and (2) conclude that the official accepted those benefits intending, in exchange for the benefits, to take official acts to benefit the payor. *See United States v. Bryant*, 655 F.3d 232, 240–41 (3rd. Cir. 2011).

The evidence is insufficient to prove beyond a reasonable doubt that Higgins did not pay for any Viagra that he received from Westwood Pharmacy. The evidence did not exclude the reasonable hypothesis that he paid by credit card. Because his credit card number was unknown, that avenue of inquiry was abandoned. Therefore, the Court finds Higgins not guilty of Counts VII–XIX.

### C. Honest Services Fraud—Nicholas Hansel (Counts XX–XXIII)

Counts XX–XXIII charge Higgins with violating 18 U.S.C. §§ 2, 1341, 1346, and 1349. Specifically, Count XX charges Higgins with 18 U.S.C. § 1349—conspiracy to commit honest services fraud.

The remaining counts, Counts XXI–XXIII, charge Higgins as a principal and as an aider and abettor of honest services fraud under 18 U.S.C. §§ 2, 1341, and 1346. The Government must prove beyond a reasonable doubt that Higgins knowingly and willfully entered into a scheme or artifice to defraud by means of using material false representations or promises, that Higgins used the mail in furtherance of that scheme, and that Higgins intended to defraud Rockbridge County of honest services. Count XXI specifically relates to the two $1,000 checks that Dana and Stephen Hansel mailed to Higgins on May 9, 2016. Count XXII concerns the $500 check mailed to Higgins on May 10, 2016 by Klein. The final count, Count XXIII relates to the $500 check Lykes mailed Higgins on May 25, 2016.

"The 'intangible right of honest services' refers to the public's right to a government official's 'honest, faithful, and disinterested services.' When a government official accepts a bribe, he undermines this public right because, although the official is 'outwardly purporting to be exercising independent judgment in passing on official matters,' in fact, the official has been paid for his decisions and, perhaps, has not even considered the merits of the matter." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008). "The scheme need not be fraudulent upon its face or misrepresent any material fact. All that is necessary is that it be a scheme reasonably calculated to deceive persons of ordinary prudence and comprehension. The intent of the crime is shown by the scheme itself. . . ." *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973).

A "*quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity 'under color of official right.'" *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012), *as amended* (Feb. 7, 2012) (citing *United States v. Antico*, 275 F.3d 245, 257 (3d Cir.2001)).

The bribe or thing of value may be paid to the public official or "any other person." *United States v. Brewster*, 506 F.2d 62, 68 (D.C. Cir. 1974); *See McDonnell v. United States*, 136 S. Ct. 2355, 2365 (2016) (defining bribery in honest services fraud context as "a public official or person selected to be a public official, directly or indirectly, corruptly" demanding, seeking, receiving, accepting, or agreeing "to receive or accept anything of value" in return for being "influenced in the performance of any official act").

The Supreme Court has explained that "[b]ribery requires intent 'to influence' and official act or 'to be influenced' in an official act. . . , there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404–05 (1999) (emphasis in original). Moreover, "'[b]ribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the 'favors and gifts flowing to a public official [are] in exchange for a pattern of official actions favorable to the donor.'" *Woodward v. United States*, 905 F.3d 40, 46 (1st Cir. 2018) (citing *United States v. McDonough*, 727 F.3d 143, 154 (1st Cir. 2013)). That is to say, "the government does not have to prove an explicit promise to perform a particular act made at the time of payment. Instead, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities arose." *United States v. Ganim*, 510 F.3d 134, 144 (2d Cir. 2007) (Sotomayor, J.). Courts distinguish the role of a payor and a payee in the honest-services context. *See United States v. Suhl*, 885 F.3d 1106, 1112–13 (8th Cir. 2018).

The Government proved, beyond a reasonable doubt, that Higgins made an agreement with at least one other person, with the intent to defraud and deprive the citizens of Rockbridge County and the Commonwealth of Virginia, of the intangible right of honest

services. Specifically, the evidence supports a finding that Hansel's family and friends provided a benefit to Higgins, intending for Higgins to take favorable official acts by giving Hansel preferential treatment—acts that Higgins would not have taken otherwise. The Government also proved that Higgins accepted these benefits intending, in exchange for the benefits, to take official acts—namely, not enforcing jail policies against Hansel.

A quid pro quo may be inferred through circumstantial as well as direct evidence. The evidence shows that Higgins took money for the Scholarship Fund while letting it influence how he made inmate management decisions within RRJ. The evidence further shows that Higgins told Bane that Hansel's family was very influential and that they donated to his political campaign. Higgins campaigned to be re-elected for the Rockbridge County Board of Supervisors—a job distinct from his role at RRJ.

One week after Higgins emailed the scholarship brochure to Dana and Stephen Hansel, on May 9, 2016, they sent two separate checks, $1,000 each, to Higgins as donations to the Scholarship Fund. The same day, Elizabeth and Chip Goodyear, who only knew of Higgins through their friendship with the Hansel family, also mailed a $500 check to Higgins. The Goodyears mentioned Hansel in the card which they included alongside their donation. The next day, May 10, 2016, Sarah Klein (Hansel's mother) mailed a $500 check to Higgins as a donation to the scholarship fund. Klein sent a card mentioning Hansel with her donation. In other words, just one week after Higgins emailed the brochure to Hansel's family, Hansel's family and friends sent him four checks totaling $3,000. Two weeks later, on May 25, 2016, Christopher Lykes, who had no direct connection to Higgins and who did not know that Higgins was the RRJ superintendent, mailed Higgins a check in the amount of $500.

The Hansel's family friends donated significant amounts to the Scholarship Fund despite having no connection to Higgins. Each letter which accompanied a donation mentioned Hansel by name. No one in the Hansel family has a connection to Rockbridge County aside from Hansel's attendance at Washington & Lee and his incarceration at RRJ. Stephen and Dana Hansel reside in Florida, and Klein lives in New Orleans.

The evidence also shows beyond a reasonable doubt that Stephen and Dana Hansel, along with Klein, donated significant sums to the Scholarship Fund intending that Higgins would take favorable official acts that he would not otherwise take. Higgins accepted these payments in exchange for giving Hansel significant privileges which were not afforded to all prisoners.

Between October 11, 2016 and March 14, 2017 there was only one occasion where Higgins, or any other jail employee, verified Hansel's compliance with work release requirements. Despite Hostetter Excavating being closed on weekends and holidays, Hansel regularly left the jail under the auspices of work release every weekend during that time, as well as on Thanksgiving Day, Christmas Day, and New Year's Day. Hansel also had unsupervised in-person contact visits with family in Higgins office, in violation of jail policy.

The preferential treatment did not end there. Evidence shows that Hansel maintained a small office space in the maintenance shed for his own use and had access to the jail telephone and other computer devices for his personal use. Higgins even brought Hansel frozen yogurt or ice cream from outside businesses—something he did not do for other inmates. The Court believes that the only reasonable explanation for Higgins' preferential treatment of Hansel were contributions to the Scholarship Fund from Hansel's family and family friends— and that the only reasonable explanation for Hansel's family

and family friends' contributions to the Scholarship Fund was to attempt to influence Higgins' treatment of Hansel.

What the evidence does not show is that Lykes, the Hansel family's friend from Florida, mailed his donation intending that Higgins take favorable official acts that he would not otherwise take. While it is true that Lykes had no prior relationship with Higgins or Simpkins, there is no evidence showing that the intent element of the payor is satisfied here. Therefore, there is reasonable doubt as to Count XXIII.

Hansel's favorable treatment combined with his family and friends' donations to the Scholarship Fund are enough to satisfy the elements of Counts XX–XXII beyond a reasonable doubt. Accordingly, the Court finds Higgins guilty of Counts XX–XXII and not guilty as to Count XXIII.

## IV.     VERDICT

It shall be **ORDERED** and **ADJUDGED** that:

1. In accordance with the Findings of Fact and Conclusions of Law, the Court finds, beyond a reasonable doubt, that Defendant John Marshall Higgins is **GUILTY** as charged as to Count I, Count II (as a misdemeanor), Count III, Count XX, Count XXI, and Count XXII.

2. In accordance with the Findings of Fact and Conclusions of Law, the Court finds Defendant John Marshall Higgins **NOT GUILTY** as charged as to Count IV, Counts VII–XIX, and Count XXIII.

3. Higgins' Motion for Judgment of Acquittal, Dkt. 209 at 80, is **DENIED** for the same reasons as the Court found above regarding Higgins' guilt

as to Count I, Count II, Count III, Count XX, Count XXI, and Count XXII.

The Clerk of the Court is hereby directed to send a copy of this Memorandum Opinion to the parties and further directed to contact the parties to establish a date for Higgins' sentencing.

ENTERED this 31st day of January, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE